IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

GREAT AMERICAN INSURANCE
COMPANY,

Plaintiff,

v.

Civil Action Number 3:05CV159

ALFRED W. GROSS, et al.,

Defendants.

## AMENDED MEMORANDUM OPINION

THIS MATTER comes before the Court on six cross Motions for Summary Judgment filed

by Plaintiff Great American Insurance Company ("Great American") and Defendants Alfred Gross

("Deputy Receiver"); Crews, Kelly, and McLean ("the Crews Defendants"); William T. Sugg

("Sugg"); Dr. Ronald Davis ("Davis"); Kenneth Patterson ("Patterson"); and Carolyn Hudgins

("Hudgins") in the above referenced case.  For the reasons expressed below, all Motions for

Summary Judgment are hereby DENIED.

## I.  BACKGROUND

Great American brought suit on March 4, 2005 seeking to rescind the Increased Limits of

the Directors' and Officers' Liability Insurance Policy Including Company Reimbursement, Policy

No. DOL7506822 ("Increased Limits"), that it issued to The Reciprocal Group ("TRG").  Great

American initially issued the policy in December 1999 with a $10 million limit of liability.  In 2001,

TRG and Great American agreed to double the policy's limit of liability to $20 million.  To obtain

the Increased Limits, TRG submitted an application ("Proposal Form") to Great American. Great

American alleges that Defendant Kenneth Patterson, President and CEO of TRG and Reciprocal of

1

America ("ROA") at the time of application, made false representations on the Proposal Form and those false representations were material to Great American's decision to issue the Increased Limits. Accordingly, Great American seeks to rescind the Increased Limits on the ground that Patterson made a material misrepresentation on the Proposal Form.

ROA was a Virginia unincorporated association and reciprocal insurer and reinsurer of doctors, hospitals, medical workers' compensation, directors' and officers' liability, and lawyer professional liability risks.  TRG was a Virginia non-stock corporation, which served as the management company and attorney-in-fact for ROA.  Together TRG and ROA comprised a single insurance business enterprise.  On January 29, 2003, the Circuit Court for the City of Richmond placed ROA and TRG into receivership under the control and direction of the Commonwealth of Virginia State Corporation Commission ("Virginia SCC").  In June 2003, the Virginia SCC determined that TRG/ROA was insolvent and ordered that TRG/ROA be liquidated.  In the wake of TRG/ROA's dissolution, policyholders left without coverage have filed a number of lawsuits against the former directors and officers of TRG/ROA. The basis of those actions and the instant suit is that the former directors and officers were engaged in a scheme to defraud insurance department regulators, insurance rating services, and policyholders into believing that ROA and its affiliates were financially solvent, when they were not.

The insurance fraud allegations stem from a criminal action that was before this Court involving Defendants Patterson and Hudgins, former Executive Vice President of TRG and ROA. On February 7, 2005, Patterson and Hudgins pled guilty to Conspiracy to Commit Insurance Fraud, in violation of 18 U.S.C. §§ 1033 and 371.  Patterson also pled guilty to Mail Fraud, in violation of 18 U.S.C. § 1341.  The Statement of Facts attached to their Plea Agreements show that from at least

2

March 2001 until 2003 Patterson and Hudgins conspired to misrepresent the true financial condition of ROA to the Virginia Commissioner of Insurance, the Board of Directors, and subscribers of ROA in an effort to save ROA from collapse.  Specifically, the conspirators concealed and misrepresented ROA's deterioration by (1) fraudulently writing down reserves; and (2) mischaracterizing the true accounting nature of various financial transactions on ROA's books, records, and reports to the Commissioner and ROA's board of directors and subscribers.

Pertinent to the instant action are the facts surrounding a $10 million transfer, improperly characterized as a prepayment expense.  In or about the fall of 2000, ROA ran a calculation of the money required to be held in a trust account for one of ROA's subsidiaries ("FVR") that was collateralizing the affiliate's reinsurance obligation to a large reinsurer, which was also ROA's reinsurer.  Due to large losses from ROA's other affiliates, the trust was short by approximately $10 to $11 million.  To address this issue, Patterson and Hudgins devised and executed a plan to transfer ROA's surplus capital to the trust as a "prepaid expense."  Characterizing the transfer as a "prepaid expense," as opposed to just transferring the surplus capital, allowed ROA to maintain an appearance of financial stability.

According to Generally Accepted Accounting Principles, a prepaid expense is treated temporarily as an asset on the payor's books and records.  The underlying theory is that if a company pays an expense before it has received the benefit, it may demand an immediate full or partial repayment thereof from the payee.  During March 2001, it became apparent to Patterson and Hudgins that characterizing the $10 million transfer as a prepayment was incorrect.  Despite this realization, they continued to represent to outside auditors and the Virginia Bureau of Insurance that the $10 million amount was a prepayment of reinsurance premiums.

3

Some of the overt acts committed by Patterson and Hudgins connected to the $10 million prepayment include:

(1)     On or about April 2, 2001, Patterson and Hudgins attempted to convince ROA's reinsurer to sign a confirmation for ROA's outside accountants that ROA had sent $10 million to its reinsurer as a prepayment of premiums normally paid during the first quarter of 2001.

(2)     In or about Spring 2001, Patterson and Hudgins gave false explanations regarding the $10 million payment to ROA's outside auditors.

(3)     On or about May 21, 2001, Hudgins sent an email to a representative of the affiliate telling him not to tell the auditors that the $10 million was a payment to bolster the affiliate's cash position.

(4)     On or about May 8, 2001, a Virginia state insurance financial examiner sent a letter to ROA questioning the substantial asset increase attributable to the "premiums due from reinsurance companies," i.e., the $10 million transfer.  In response, Hudgins sent a letter on or about June 6, 2001 explaining that ROA had a favorable cash position at the end of 2000 and made a business decision to make the prepayment, failing to mention the need to bolster the trust of the affiliate as the real reason for the payment.

During the course of the conspiracy, Patterson completed the Proposal Form for an increase in the policy limits covering the directors and officers of TRG.  TRG returned the signed Proposal Form on or about April 30, 2001. Question 7 of the application posed:

Is the undersigned or any Director or Officer proposed for the increased Limit of Liability aware of any fact, circumstance or situation involving the Company or its Subsidiaries or the Directors or Officers of the Company or its Subsidiaries which he has reason to believe might result in any future Claim which would fall within the scope of the Increased Limit of Liability?  If "Yes," provide details.

Patterson marked an "x" in the box labeled "No."  Additionally, immediately preceding the signature block, the Proposal Form, in relevant part, states:

The undersigned Chief Executive Officer (or other Senior Officer if the Chief Executive Officer is also the Chairman [of the] Board of Directors) and Chairman of the Board of Directors declare that to the best of their knowledge the statements set forth herein are true and correct and that reasonable efforts have been made to obtain sufficient information from each and every Director or Officer proposed for

4

this Endorsement for the Increase in coverage to facilitate the proper and accurate completion of this Proposal Form.

Great American's rescission claim on the grounds of false representation is premised on Patterson's response to Question 7 and his signature affirming that he made reasonable efforts to obtain information from the other Directors and Officers in order to facilitate the proper and accurate completion of the Proposal Form. The Defendants oppose Great American's claim on various grounds.[1]

The summary judgment motions raise three primary issues for the Court to address: (1) whether Great American can establish by clear proof that Patterson's representations were (a) false and (b) material to Great American's decision to issue the Increased Limits; (2) whether Great American waived its ability to rescind; and (3) whether Patterson's representations may be imputed to an "innocent" insured.

## II. <u>STANDARD OF REVIEW</u>

Where the language of a contract is plain and unambiguous, its interpretation is a question of law that may be determined by the court on a motion for summary judgment. <u>See</u> <u>World-Wide Rights Ltd. P'ship v. Combe, Inc.</u>, 955 F.2d 242, 245 (4th Cir. 1992). A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The Court must view the facts and the inferences drawn

---

[1]Dr. Davis adopted the arguments and briefs filed by the Crews Defendants. Patterson and Hudgins, without waiving their rights against self-incrimination, adopted the arguments of the Crews Defendants as well. Sugg adopted the arguments asserted by the Crews Defendants and adds an additional argument with respect to innocent insureds, which is discussed in further detail herein.

therefrom in the light most favorable to the non-moving party.  <u>Ballinger v. North Carolina Agric.</u>

<u>Extension Serv.</u>, 815 F.2d 1001, 1004 (4th Cir. 1987).  While viewing the facts in such a manner,

courts look to the affidavits or other specific facts to determine whether a triable issue exists.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Summary judgment is not "a disfavored

procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have

no factual basis."  <u>Celotex</u>, 477 U.S. at 327.  If "no genuine issue of material fact exists," it is the

"affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from

proceeding to trial."  <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation

marks omitted).

### III. <u>DISCUSSION</u>

#### A.    Choice of Law

As a preliminary matter, the Court must determine whether New York or Virginia law

governs the substantive issues in this case.  Great American, Sugg, and the Deputy Receiver agree

that Virginia law governs, while the Crews Defendants argue that New York law applies.  Where

subject-matter jurisdiction is premised on diversity of citizenship, the Court must apply the choice

of law principles of the forum state in which it sits. <u>Federal Ins. Co. v. Ward</u>, 166 F. App'x 24, 28

(4th Cir. 2006); <u>Asbestos Removal Corp. of America, Inc. v. Guaranty Nat'l Ins. Co.</u>, 846 F. Supp.

33, 34 (E.D. Va. 1994).  As this Court sits in Virginia, Virginia's choice of law rules apply.

Virginia's choice of law rules provide that insurance contracts are governed by the law of

the state "where an insurance contract is written and delivered." <u>Buchanan v. Doe</u>, 431 S.E.2d 289,

291 (Va.1993) (citations omitted).  Generally, "an insurance policy is a contract to be construed in

accordance with the principles applicable to all contracts." <u>Seabulk Offshore, Ltd. v. Am. Home</u>

Assur. Co., 377 F.3d 408, 419 (4th Cir. 2004).  In Virginia, "a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured."  Id.; see also Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635-36 (4th Cir. 2005).

Relying on Seabulk, the Crews Defendants contend that because the Increased Limits  was delivered to the insurance broker, the Willis Corroon Corporation ("Willis"), in New York, New York provides the substantive law for this case, while Virginia law governs procedural issues including the standard of proof and the notice to claimant requirement period under Va. Code § 38.2-2226. In opposition, Great American offers that it sent two sets of the original endorsements effecting the Increased Limits.  One set was for Willis to retain and the other was for Willis to deliver to TRG in Virginia.[2]

While case law is clear that an insurance contract is not made until "delivered" to the insured, what constitutes "delivery" is not as easily discerned. Citing Rose v. Travelers Indem. Co., 167 S.E.2d 339 (Va. 1969),[3] the Fourth Circuit has stated that under Virginia law, "[a]n insurance policy is delivered on the date the company mails the policy to its agent for delivery to the insured," which implies that the state in which the insurance policy is made and mailed governs delivery. Condon v. Inter-State Assurance Company, 1988 WL 67599, at *1, 3 (4th Cir. 1988) (holding that the life insurance policy did not become effective until the insurance company delivered the policy

---

[2]The Producer Agreement between Great American and Willis shows that one of Willis' limited duties was to deliver the contract to the insured. (Producer Agrmt. 2(a)).

[3]In Rose, the Virginia Supreme Court held that "[w]hen an insurer mails a contract of insurance to its agent for unconditional delivery to the insured, delivery is effected when deposited in the mail."  167 S.E.2d at 342.

by "placing the policy in the mail to the insured").  In <u>Highway Express, Inc. v. Fed. Ins. Co.</u>, 1994 U.S. App. LEXIS 5427 (4th Cir. 1994), the Fourth Circuit explained that "'delivered' has been interpreted to mean the place where the last act necessary to give a contract validity took place."[4] <u>Id.</u> at *10 (internal quotations omitted).

Most recently, the Fourth Circuit held in <u>Seabulk</u> that the insurance policy at issue was governed by Virginia law because the insurer, whose principal place of business was in New York, delivered the policy to the insured in Virginia and "in the context of an insurance policy, the last act is the delivery of the policy to the insured."  377 F.3d at 419.  <u>Seabulk</u> suggests that the state where the insured took physical possession of the policy is the state of delivery.  Thus, there is case law which supports either applying the law of the state where the policy is mailed or the law of the state where the insured received physical possession of the policy.

In the case at bar, Great American issued the Increased Limits for delivery to Virginia for subjects located in Virginia (i.e., TRG).  Great American mailed two sets of the policy from its offices in Illinois[5] to the insurance broker Willis in New York.  Willis, in compliance with its prescribed duties under the Producer Agreement with Great American, sent the policy to TRG in Virginia.  Thus, the key issue is whether delivery of the Increased Limits to Willis, in New York,

---

[4]The Fourth Circuit in <u>Highway Express</u>, faced the same issue that is presented in this case.  One party argued that North Carolina law should control because the policy was delivered to the agent in North Carolina.  1994 U.S. App. LEXIS 5427, at *3.  The other party asserted that the licensed agent was the agent of the insurer and, therefore, the policy was not delivered until the agent personally delivered it to the insured at its headquarters in Richmond, Virginia.  <u>Id.</u> at 3-4.  The Fourth Circuit found that it did not need to resolve the issue because both Virginia and North Carolina provided the same law with respect to ambiguous provisions in an insurance contract.  <u>Id.</u> at 4.

[5]Although case law may support an argument for application of Illinois law, neither party has raised this for consideration.

constituted delivery of the policy to TRG, the insured.  Because Willis was merely a conduit and not

a party necessary to effectuate the policy and Seabulk points to the state where the insured took

physical possession of the policy, the Court finds that Virginia law governs the substantive issues

in this case.

> **B.**     **Whether Great American can Establish by Clear Proof that Patterson's Representations were (1) False and (2) Material to Great American's Decision to Issue the Increased Limits**

"Under Virginia law, an insured is obligated to answer an application truthfully and fully to

give the insurer the opportunity to make its own inquiry and determine whether to undertake the

risk."  Carolina Cas. Ins. Co. v. Draper & Goldberg, P.L.L.C.,138 F. App'x 542, 547 (4th Cir. 2005)

(citing Mutual of Omaha Ins. Co. v. Echols, 154 S.E.2d 169, 172 (Va.1967)).  An insurer seeking

to rescind a contract based on an insured's alleged misrepresentation must clearly prove that (1) the

insured's representation on the application was false; and (2) the false statement was material to the

insurance company's decision to undertake the risk and issue the policy.  Va. Code Ann. § 38.2-309

("No statement in an application or in any affidavit made before or after loss under the policy shall

bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement

was material to the risk when assumed and was untrue."); see also Draper & Goldberg,138 F. App'x

at 547; Commercial Underwriters Ins. Co. v. Hunt & Calderone, P.C., 540 S.E.2d 491, 493 (Va.

2001).

1.

"The question of whether a misrepresentation was made, if disputed by the insured, is

ordinarily one for the [trier of fact]."  Huberts v. Traveler's Indem. Co., 1997 WL 265232, at *3 (4th

Cir. 1997).  Thus, if the trier of fact "could reasonably resolve the issue in favor of the insured,

9

summary judgment for the insurer is precluded." Id.  Nonetheless, if the record clearly shows that the insured gave statements that were not true and correct to the best of the insured's knowledge and belief, where asked to do so, then the Court may resolve the question as a matter of law. Parkerson v. Federal Home Life Ins. Co., 797 F. Supp. 1308, 1315 (E.D. Va. 1992).  Here, Great American contends that Patterson made two false statements and each provides a separate, independent basis for rescission.  Specifically, (a) Patterson's response to Question 7 was false; and (b) Patterson's signature affirming that he made reasonable efforts to consult with the other directors and officers in completing his application was untrue as well.

a.

In Virginia, insurance policies are a matter of contract and the parties to an insurance policy are bound by its clear and unambiguous terms.  Seabulk, 377 F.3d at 419.  Thus, where the terms of the policy are unambiguous, Virginia courts will enforce the policy as written and give the language its plain and ordinary meaning. Id.  "Conversely, when the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be construed strictly against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured." Id.  Policy language is ambiguous when it is susceptible to more than one reasonable construction.  Id.

Here, Question 7 asks the applicant whether he or "any Director or Officer" proposed for the Increased Limits is "aware of any fact, circumstance or situation" involving the Company, its Subsidiaries, or its Directors or Officers, "which he has reason to believe might result in any future Claim which would fall within the scope of the Increased Limit of Liability."  The parties do not dispute the substantive meaning of Question 7; instead, they dispute whether Question 7 called for

an objective or subjective inquiry.  The Crews Defendants argue that the application sought the signer's subjective evaluation as to whether he was aware of a set of facts that might lead to a claim sufficiently large enough to pierce the excess layer of coverage.  Conversely, Great American argues that the question called for an objective evaluation.  Their dispute centers around the following language: "which *he* has *reason to* believe."  The Crews Defendants highlight "he," while Great American emphasizes "reason to."

In Virginia, an insured's prior knowledge may be assessed under an objective or subjective standard depending on the terms of the policy.  For instance, where the insurance application for professional liability insurance inquired whether any attorney in the firm was aware of an act or omission that "may reasonably be expected to be the basis of a claim against them," the district court noted that Virginia courts have assessed an insured's state of mind under an objective standard.  Continental Cas. Co. v. Graham & Schewe, 339 F. Supp. 2d 723, 727 (E.D. Va. 2004) (citing Commercial Underwriters, 540 S.E.2d at 493-94).  Those courts have inquired "whether a reasonable person in possession of the facts known to the insured, would have had a reasonable basis to know that a claim might be made."  Id.; see also TIG Ins. Co. v. Robertson, Cecil, King & Pruitt, 2003 WL 253167 at *3 (W.D. Va. 2003), aff'd, 116 F. App'x 423 (4th Cir. 2004) (holding that an insured's negative response to a question asking him whether he was aware of any wrongful act that might give rise to a future claim was false where "any reasonable attorney would know that stealing large amounts of money from clients would likely produce a claim").

Other courts have applied a subjective standard where the application asked the prospective insured to affirm that he has completed the application "to the best of [his] knowledge." In Parkerson v. Fed. Home Life Ins., 797 F. Supp. 1308 (E.D. Va. 1992), the court explained that while an insurer

generally is not required to establish that an untrue representation was willfully false or fraudulently made, "where . . . the insurer asks the insured to aver only that the representations are true to the best of the insured's knowledge and belief, the insurer must clearly prove that the insured's answers were knowingly false." Id. at 1315; see also Sterling Ins. Co. v. Dansey, 81 S.E.2d 446, 451 (Va. 1954) (finding that where the answers in an application for insurance are stated to be true to the best knowledge and belief of the applicant, an incorrect statement innocently made in belief of its truth will not avoid the policy).

A review of the Proposal Form reveals that Patterson signed the application affirming, in pertinent part, as follows: "The undersigned . . . declare that *to the best of their knowledge the statements set forth herein are true and correct* and that reasonable efforts have been made to obtain sufficient information from each and every Director or Officer proposed for this Endorsement for the Increase in coverage to facilitate the proper and accurate completion of this Proposal Form." (Emphasis added). Stated differently, Patterson was asked to complete the application to the best of his knowledge. Thus, the Court finds that a subjective standard applies in the present case.

Nonetheless, even when applying a subjective standard, "the non-moving party's subjective state of mind must be reasonable in light of the objective facts." Parkerson, 797 F. Supp. at 1317. In the case at bar, Great American contends that when Patterson responded negatively to Question 7, Patterson *knowingly* made a false statement. Great American bases its contention on Patterson's admission that when Patterson completed the Proposal Form for the Increased Limits on or about March 2001, he was aware that classifying the $10 million transfer from ROA to FVR as a prepayment expense was improper. The Statement of Facts also shows that despite knowing that the classification was inappropriate, Patterson and Hudgins continued to represent to outside

12

auditors that the $10 million amount was a prepayment of reinsurance premiums.  Patterson's and Hudgins' behavior constituted insurance fraud, resulting in criminal liability for both parties.  The purpose of the conspiracy was to prevent ROA from collapsing.  Accordingly, Great American argues that Patterson's knowledge of and active engagement in a criminal conspiracy to defraud insurance regulators and others about the true financial condition of TRG, ROA, and related companies with the general purpose of preventing ROA from collapsing rendered Patterson's response to Question 7 knowingly false.

Conversely, the Crews Defendants contend that Great American is impermissibly relying on hindsight and speculation to infer that Patterson had knowledge of facts that might lead to a claim that would invade the $10 million excess layer of coverage.  They allege that Great American can not clearly prove that Patterson was aware that the improper classification of the $10 million transfer would possibly result in a future claim which would fall within the scope of the Increased Limits. Stated differently, Great American can not clearly prove that Patterson reasonably believed that the improper classification of the $10 million transfer would lead to claims that would ultimately exhaust the initial $10 million coverage and permeate the additional $10 million in coverage or that Patterson was aware of existing claims that would fall within the purview of the Increased Limits. Citing Pereira v. National Union Fire Ins. Co. of Pittsburgh, Pa., 2006 WL 1982789 (S.D.N.Y. 2006),[6] the Crews Defendants argue that Patterson was only required to disclose a claim when, in

---

[6]In Pereira, the New York district court determined that there was a question of fact as to whether the insured was aware of the existence of any acts that would give rise to claims that would reach the excess coverage at the time of his application.  2006 WL 1982789 at *5. The Pereira court explained that even if the court imputed knowledge of the pending litigation to the insured, it is possible that the insured believed that any judgment from that action could not have reached the excess coverage. Id.

his judgment, that claim is of such a magnitude that it is probable that it will reach the excess layer. Because nothing in Patterson's Statement of Facts accompanying his Plea Agreement speaks to the reasonable estimate of the amount of any potential claim at any particular point in time, Great American can not prove that Patterson's response to Question 7 was false.

The Court finds that there is ample evidence in the record to support either party's contention. The trier of fact could find that Patterson knew his response to Question 7 was false based on the guilty plea and other evidence presented by Great American.[7] Similarly, the trier of fact could determine that Great American has failed to meet its burden of clear proof that Patterson knew his response to Question 7 was false because (1) there were no claims existing at that time and (2) even if Patterson was on notice of potential claims, that does not necessarily mean that he knew those claims would permeate the Increased Limits.

b.

The paragraph immediately before Patterson's signature on the Proposal Form provided that by signing, the applicant declares that "reasonable efforts have been made to obtain sufficient information from each and every Director or Officer proposed for this Endorsement for the increase in coverage to facilitate the proper and accurate completion of this Proposal Form." According to

---

[7]For instance, Great American has submitted evidence which suggests that Patterson was aware of a potential claim from General Reinsurance Corporation ("Gen Re"). In a letter dated April 2, 2001 from Patterson to Victoria Wixtead, Vice President of Gen Re, Patterson asks Wixtead to sign the letter to confirm that the $10 million transfer to the affiliate was explained as a prepayment that ROA made to the fund for premiums expected to normally have been remitted during the first quarter 2001. Wixtead refused to sign because as of December 28, 2000 it was Gen Re's position that the $10 million transfer should not be treated as prepaid insurance and allegedly Patterson promised not to classify the transfer as such. Accordingly, Great American argues that, Patterson knew that Gen Re had a basis for possible action - Patterson's statement to Wixtead that ROA would not call the $10 million transfer prepaid insurance.

Great American, three Defendants (Richard Bland, Dr. Davis, and Gordon McClean[8]) admitted that no one ever inquired about their awareness of any fact, circumstance or situation involving the Company or its Subsidiaries or the Directors or Officers of the Company which they had reason to believe might result in any future claim which would fall within the scope of the Increased Limits. Conversely, the Crews Defendants contend that Great American limited the information it sought to Questions 1, 7, and a signature, and never directed compliance with other aspects of the Proposal Form, including the polling of hundreds of directors and officers.

        These are issues of material fact best left to be resolved at trial.  The trier of fact may find that showing two out of hundreds of directors and officers were not asked about their awareness of potential claims is clear proof that Patterson failed to make "reasonable efforts" to consult the directors and officers seeking coverage under the Increased Limits or he may conclude otherwise. In sum, the Court finds that summary judgment is improper on the issue of falsity because the facts remain vigorously contested and merit further development.

2.

        "If a misrepresentation is proved to have been made, its materiality to the risk assumed is a question of law to be determined by the court."  Huberts, 1997 WL 265232, at *2 (citing Harrell v. N.C. Mut. Life Ins. Co., 213 S.E.2d 792, 794 (Va.1975); see also Draper & Goldberg,138 F. App'x 542, 550 ("When an insurer has proved that the insured misrepresented a fact in the application, the materiality of that misrepresentation is a question of law for the court"); Graham & Schewe, 339 F. Supp. 2d at 728.  An insurer must clearly prove that had the insured responded

---

        [8]McLean notes that he was not asked any such question "because I was not a Director or Officer of ROA, TRG, or any other Reciprocal Group entity in April or May 2001."  (Pl's Ex. 17 McLean's Responses to Plaintiff's First Requests for Admission ¶ 17).

15

truthfully the insurer would not have issued the policy or would have issued the policy on different terms. See Commercial Underwriters Ins. Co., 540 S.E.2d at 493. "[I]nformation is material when a reasonable person would regard it as likely to affect the insurance company's assessment of the risk and thus its decision whether - *and on what terms* - it is willing to provide coverage." Darling v. Savers Life Ins. Co.,1997 WL 768545, at *3-4 (4th Cir. 1997). Thus, here, Great American must clearly demonstrate that had Patterson responded to Question 7 in the affirmative or that if it knew that Patterson had not consulted with the other Directors or Officers, it would not have issued the Increased Limits or altered the terms of issuance.

To prove materiality, Great American primarily offers email communications between the parties and the Affidavits of its underwriters. For instance, in an April 6, 2001 email from Kathryn Brown of Willis of Maryland to Robert Hinman ("Bob") of TRG, forwarding a blank copy of the Proposal Form, Brown states, in pertinent part, "Bob, I am forwarding the Warranty Letter that Great American is requiring for the D&O increased limits per my email of March 21st. The only items that need to be completed are #1 and #7 plus the signature and date section on the last page." Additionally, there is what appears to be a post-it note from Bob to Patterson stating, "Ken [Patterson], we must submit this form as a warranty against any know[] claims, in order to secure the additional D&O limits. Please sign and return to me. Thanks Bob."

Great American also submitted the Affidavits of Thomas Siebers and Michael D. Pierce. Siebers, who reviewed and granted the underwriting acceptance of the Proposal Form signed by Patterson, attested that he would not have issued the Midterm Binder had Patterson responded in the affirmative to Question 7 or had the Proposal not been signed. (Siebers Aff. 8). Pierce, a Senior Vice President with Great American, explains that after Siebers granted underwriting acceptance

16

of the Proposal Form signed by Patterson, Great American agreed to bind the Increased Limits.  The Midterm Binder was initially subject to a "Past-Acts Exclusion" term.  Great American later amended the Policy by endorsement to reflect the increase, but without the prior acts exclusion, because Mr. Siebers agreed to waive completion of other parts of the Proposal Form based on an earlier agreement made by one of Great American's other underwriters.[9]  Thus, based on the April 6, 2001 email and the Affidavits of its underwriters, Great American contends that it has clearly proven that Patterson's representations were material to its decision to issue the Midterm Binder and the Increased Limits.

Conversely, the Deputy Receiver and the Crews Defendants argue that Great American cannot clearly prove that it relied on Question 7 or Patterson's representation that he consulted with the other Directors and Officers prior to issuing the Increased Limits.  The Defendants premise their argument on two separate contentions:  (1) Great American bound coverage through its agent prior to receiving and reviewing the Proposal Form; and (2) The Midterm Binder issued by Great American shows that the Proposal Form was only material to the "Past-Acts Exclusion" term.  With

---

[9]Apparently, Robert Herm, the underwriter initially responsible for the ROA file and who subsequently left Great American to take a job with a competitor, indicated that ROA only needed to complete Questions 1 and 7, and sign the Proposal Form.  Siebers learned that Herm agreed to waive the requirements that TRG answer Questions 2-6 and 8 on the Proposal Form and that TRG provide the materials specified in Item 9 of the Proposal Form after issuing the Midterm Binder on May 25, 2001.  Because the Binder was issued prior to Siebers' learning of Herm's agreement, Endorsement D-514 was placed in the Binder on condition of "Great American's receipt, review and underwriting acceptance of a *fully* completed Proposal Form for Increased Limits."  (Siebers Aff. 9) (emphasis added).  Upon learning of Herms' agreement, Siebers agreed to accept the partially completed Proposal Form Great American received on May 16, 2001 and delete Endorsement D-514, without requiring TRG to answer any of the other questions on the Proposal Form.  (Id. at 11).

respect to their first contention, the Defendants highlight an email sent by Kathryn Brown of Willis

to Hinman of TRG on March 21, 2001.  In the email, Brown writes:

> Bob,
>
> This is to confirm that we have bound coverage for the $10,000,000 excess of
> $10,000,000 limits effective for the period March 21, 2001- December 1, 2002 at a
> premium of $76,230.  As we discussed, Great American is requiring a warranty [the
> Proposal Form] for the increased limits.  I will forward the wording on this to you
> as soon as I receive it.  I will also get an invoice to you shortly.  Please let me know
> if you have any questions.
>
> Regards,
> Kathryn

Accordingly, because Willis, the insurance broker, purportedly bound coverage on March 21, 2001

prior to receiving the Proposal Form, the Defendants contend that the Proposal Form was not

material to Great American's decision to bind coverage.[10]

Second, even if coverage was not bound until Great American issued the Midterm Binder,

the Midterm Binder only lists one condition for issuance of the Increased Limits, "Payment of

Premium."  The Proposal Form is described, not as a condition for issuance of the excess coverage,

but only as a condition for removal of the "Endorsement D-514," which is a "Past Acts Exclusion

On Excess Limits of Liability Endorsement."[11]  Thus, the Defendants contend that the only condition

_____

[10]In support, the Deputy Receiver cites Bituminous Cas. Corp. v. Baldwin, 86 S.E.2d 836,
839 (Va. 1955), which holds that oral binders or contracts for temporary insurance are binding
on an insurance company when made by a duly authorized agent acting within the apparent or
ostensible scope of its authority.  Id. at 839.

[11]The Midterm Binder's Condition section states:

7. CONDITIONS: As outlined in quotation no. _____ dated _____, and
modifications as listed below (if any):
    1.      PAYMENT OF PREMIUM
    2.      ENDORSEMENT D-514 WILL BE DELETED UPON RECEIPT, REVIEW

of Great American's approval of the Increased Limits was TRG's payment of the required premium and the Proposal Form was only used to evaluate whether Endorsement D-514 would be deleted.

The Court finds that the determination of whether Great American has clearly proven that Patterson's representations were material to its decision to issue the Increased Limits, while a question of law for the Court to ultimately determine, involve underlying questions of fact. See Breault v. Berkshire Life Ins. Co., 821 F. Supp. 410, 414 (E.D. Va. 1993) (finding that the question of materiality is "often a mixed question of law and fact" for the court, and not the jury, to determine).  At tension here is the material enclosed in Great American's contemporaneous underwriting file (i.e., the Midterm Binder and Worksheet), the affidavits of its underwriters, and the communications generated between Great American, its agent, and ROA.  Because the evidence presented by the parties warrants further development, the Court will make a determination on the issue of materiality after the trial of this case has concluded.

**C.      Whether Great American Waived its Right to Rescind the Increased Limits**

The Crews Defendants argue that Great American waived its right to rescission by non-compliance with VA Code § 38.2-2226.  Great American counters (1) that the Crews Defendants lack standing to raise the statute as a defense and (2) the statute does not apply in rescission cases.

Section 38.2-2226 requires an insurer to notify the insured of "a breach of the terms or conditions of the insurance contract by the insured" within forty-five days after the discovery by the insurer of the breach or of the claim, whichever is later.  The Virginia Supreme Court has held that the purpose of the statute "is to require a liability insurer that intends to rely on a breach of the terms

---

AND UNDERWRITING ACCEPTANCE OF A PROPOSAL FORM FOR INCREASED LIMITS.

and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant or his attorney so that steps may be taken by the claimant, a stranger to the insurance contract, to protect his rights." Dan River, Inc. v. Commercial Union Ins. Co., 317 S.E.2d 485, 488 (Va. 1984); accord State Auto Prop. & Cas. Ins. Co. v. Gorsuch, 323 F. Supp. 2d 746, 756 (W.D.Va. 2004). As such, "[t]he statute has no effect upon the contractual relations between the insured and the insurer." Id.

Similarly, in Continental Insurance Co. v. Matney, 2004 WL 866923 (W.D. Va. 2004), the court noted that § 38.2-2226 pertains to violations of specific terms and conditions of the policy as opposed to disputes where the insurer claims that the very terms and conditions of the policy should be of no legal effect from the very first moment when the policy was issued. Id. at 3-4; see also Maxey v. Doe, 225 S.E.2d 359, 361 (Va. 1976) (holding that waiver pursuant to § 38.2-2226 only occurs "where the rights of a claimant who is a stranger to the insurance contract may be prejudiced"); Allstate Ins. Co. v. Kinard, 1998 WL 972156, at *2 (Va. Cir. Ct. 1998) (finding that § 38.2-2226 does not apply to a first party insurance claim by an insured against its carrier because § 38.2-2226 protects the rights of claimants who are strangers to the contract). Because § 38.2-2226 serves to protect claimants, who are strangers to the contract, and not the insured, the Court finds that the code provision is not applicable to this case and Great American has not waived its ability to rescind the Increased Limits.

### D.      Whether Patterson's Representations may be Imputed to an Innocent Insured

Defendant Sugg is a former member and chair of the board of directors of the TRG. As an outside director of TRG, he asserts that he had no knowledge of the criminal activities of Patterson and Hudgins and never participated in them. In addition to agreeing with the Crews Defendants that

20

Great American cannot meet its burden of proof to rescind the insurance contract, Sugg also argues that Patterson's representations cannot be imputed to him, an innocent insured, as a basis for rescission under the terms of the Increased Limits.

Whether Great American can impute Patterson's representations to an "innocent" insured turns on the Court's interpretation of the following provision in the Proposal Form:

> It is further agreed by the COMPANY and the DIRECTORS and OFFICERS that the statements in the Proposal Form or in any material submitted therewith are their representations, that they are material and that this Policy is issued in reliance upon the truth of such representations; provided, *however, that except for material facts or circumstances known to the person(s) who subscribed the Proposal Form*, any misstatement or omission in such Proposal Form or materials submitted therewith in respect of a specific WRONGFUL ACT by a particular DIRECTOR or OFFICER or his cognizance by any matter which he has reason to suppose might afford grounds for a future CLAIM against him shall not be imputed to any other DIRECTOR or OFFICER for purposes of determining the validity of this Policy as to such other DIRECTOR or OFFICER.  (Emphasis added).

Relying on Atlantic Permanent Federal Savings & Loan Association v. American Casualty Company of Reading, Pa., 839 F.2d 212 (4th Cir.1988),[12] Defendant Sugg argues that the above clause limits rescission to persons in two categories: (1) the person(s) who subscribed the Proposal Form, at least where that person knew of material facts or circumstances, and (2) the "particular Director or Officer" who was responsible for the wrongful act. Conversely, relying on the exception clause in

---

[12]In Atlantic Permanent, the insurance policy contained the following provision: "this policy shall not be voided or rescinded and coverage shall not be excluded as a result of any untrue statement in the [application] form, except as to those persons making such statement or having knowledge of its truth." 839 F.2d at 215.  The Fourth Circuit acknowledged that the Virginia Supreme Court has upheld provisions in insurance policies that limit the insurer's right to void the policy for misrepresentation, and held that this provision was "plainly designed to prevent misrepresentations made by the particular officers responsible for preparing an application form from depriving their innocent colleagues of coverage, and to refuse to give it effect here would undermine the parties' manifest intent."  While Atlantic Permanent and the instant case present the same issue, the language at issue in the case at bar differs significantly from the terms in the policy provision in Atlantic Permanent and this Court's conclusion is guided by the language of the instant insurance agreement.

the above provision (i.e., *however, that except for material facts or circumstances known to the person(s) who subscribed the Proposal Form*), Great American claims that the Increased Limits may be rescinded with respect to "innocent" insureds so long as (1) the Proposal Form contained a material misrepresentation, and (2) the misrepresentation concerned material facts or circumstances known to the person who subscribed the Proposal Form.

As previously discussed, where a policy is ambiguous and the intentions of the parties cannot be ascertained, Virginia courts strictly construe the policy against the insurer. Seabulk, 377 F.3d at 419.  A term or clause is ambiguous if it is susceptible to more than one reasonable interpretation. Id.  Here, although the clause is "atrociously drafted," it is not susceptible to more than one meaning. See First State Ins. Co. v. Federal Sav. & Loan Ins. Corp, 1990 WL 105578, at *3 (9th Cir. 1990).[13]

Sugg's interpretation of the provision ignores the exception clause.  Sugg attempts to argue that the exception clause applies to a director who subscribed the application with knowledge of facts and circumstances underlying the misrepresentation, even though the subscribing director may not have been the person who committed the wrongful act.  Such a reading, however, ignores that the provision imputes material facts or circumstances known to the person who subscribed the Proposal Form to all covered parties.  See Seabulk, 377 F.3d at 419 ("Under Virginia law, if policy

---

[13]In First State Insurance Co. v. Federal Savings & Loan Insurance Corp., 1990 WL 105578 (9th Cir. 1990) (applying California law) (unpublished), the Ninth Circuit addresses the issue of ambiguity when faced with a similar provision in an insurance policy.  The provision at issue provided that "except for material facts or circumstances known to the person who subscribed the proposal form ... any misstatement or omission in such proposal form . . . shall not be imputed to any other Director or Officer." Id. at 2.  Rejecting the appellees' argument that the clause voids coverage only as to the subscribing officer who made knowing misstatements, the Ninth Circuit reasoned that while the clause is "atrociously drafted and wastefully difficult... [w]e decline to extend the definition of ambiguity... to encompass language that is difficult but not reasonably susceptible to the interpretation proffered by the party claiming ambiguity." Id. at 3.

language is clear and unambiguous, we do not apply rules of construction; rather, we give the language its plain and ordinary meaning and enforce the policy as written.").

Sugg contends that Great American's reading of the provision defies "common sense" because it allows for complete rescission based on the mere "happenstance" or "fortuity" of who signs the Proposal Form. However, as Great American points out, there is nothing fortuitous about the person designated to sign the Proposal Form. The Proposal Form requires the signature of (1) the Chief Executive Officer or other Senior Officer if the Chief Executive Officer is also the Chairman, Board of Directors and (2) Chairman of the Board of Directors. Under Virginia law, an insurance company is permitted to rely on the representations of its insured in an insurance application when reaching a determination of whether to take on a specified risk. Draper & Goldberg, 138 F. App'x at 547 (noting that "[u]nder Virginia law, an insured is obligated to answer an application truthfully and fully to give the insurer the opportunity to make its own inquiry and determine whether to undertake the risk"). Thus, it makes sense that Great American would require a high-ranking officer in the company to complete the application and then impute the material facts or circumstances known to that officer to all the Directors and Officers because Great American is relying on those representations when determining whether to assume the risk of insuring and on what terms.

Sugg also urges the Court to interpret the provision as a limitation on Great American's right to rescind with respect to innocent insureds because a comprehensive reading of the Policy as a whole embraces non-imputation of bad acts to innocent insureds. Sugg relies on the "NOTE" and Part (D) of Section IV of the Policy, which summarily provide that the criminal act of a Director shall not be imputed to other innocent directors and officers. Quoting the reasoning of the court in

Robertson, Cecil, King & Pruit, Great American persuasively rebuts that "[t]here is an obvious difference between affording coverage to an innocent insured under this Policy provision and rescinding the Policy because the [insured], through its authorized partner, lied on the application." 2003 WL 253167 at *3.

In Robertson, Cecil, King & Pruit, the court explained although the policy provided coverage to innocent partners for claims that arise out of the criminal conduct of one partner, the policy provision did not reference or preclude the remedy of rescission for a material misrepresentation. Id. Further, while the record was clear that the defendants were innocent of their partner's criminal acts, it is also clear that the insurance company was innocent in its reliance on the misrepresentation that no lawyer in the law firm had knowledge of blameworthy conduct. Id. at 4. Thus, between the innocent insured and the innocent insurance company, the court determined that it was not unjust for the partners, "who had the opportunity to know him best - should bear the loss." Id. The same reasoning is applicable here.

Thus, because the policy provision imputes the misrepresentation of material facts and circumstances to innocent insureds, the Court concludes that the rescission of the policy is equally applicable to an innocent insured.

## IV. CONCLUSION

In sum, the Court concludes that Great American has not waived its right to rescind and if Great American clearly proves rescission, rescission will apply to all defendants including the "innocent" insured. The remaining issue in this case is whether Great American can clearly prove that (1) Patterson made false representations on the Proposal Form and (2) Patterson's representations were material to its decision to increase the limits of the insurance policy. Finding

24

that the falsity of Patterson's statement is a disputed question of fact, all Motions for Summary

Judgment are denied.  If necessary, the Court will rule on the issue of materiality after the trial of

this case has concluded.

_____/s/_____
James R. Spencer
Chief U. S. District Judge

Entered this __11th__ day of February 2008